UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CANDACE FOLLEN, et al.,

    Plaintiffs,                                    Civil Action No. 20-CV-10450

vs.                                               HON. BERNARD A. FRIEDMAN

GENESYS REGIONAL
MEDICAL CENTER, et al.,

    Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is presently before the Court on defendants' motion for summary judgment [docket entry 12]. Plaintiffs have responded and defendants have replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing. For the reasons stated below, the Court shall grant the motion in part and deny it in part.

This is an employment discrimination case. Plaintiffs Candace and James Follen are former employees of defendant Genesys Regional Medical Center (hereinafter "the hospital"). Candace Follen worked at the hospital for twelve years, most recently as a surgical technician; her husband, James Follen, worked there for thirteen years, most recently as a registered nurse. The individual defendants (Katherine Robertson-Cain, Paula Coffee, Kriss Weiss, and Melissa Sparks) are hospital employees who allegedly were involved in plaintiffs' termination. Plaintiffs allege that they were discharged in retaliation for Candace Follen reporting to the Michigan Occupational Safety and Health Administration ("MIOSHA") that, and then assisting in MIOSHA's investigation into whether, the surgical gowns provided to hospital workers were unsafe and unsterile because they were permeable and allowed blood to leak through. First Am. Compl. ("FAC") ¶ 9. Plaintiffs

assert claims under Michigan's Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361, et seq., and for violation of Michigan public policy (Counts I and II). Plaintiffs also allege that defendants discharged them for taking intermittent medical leave, thereby interfering with and retaliating against them in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. (Counts III and IV).

*Public Policy Violation Claim*

Defendants first argue that they are entitled to summary judgment on plaintiffs' "public policy violation" claim (Count II) because such a claim is not cognizable when "there exists a statute explicitly proscribing a particular adverse employment action." Defs.' Br. at 12 (quoting *Kimmelman v. Heather Downs Mgmt.*, 753 N.W.2d 265, 268 (Mich. Ct. App. 2008)). Defendants argue that a remedy for plaintiffs' allegedly retaliatory discharge is provided by the WPA and the Michigan Occupational Safety and Health Act, as these statutes contain anti-retaliatory provisions that plaintiffs could invoke in this case.[1]

---

[1] The WPA states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362. Section 15.363 allows "[a] person who alleges a violation of this act [to] bring a civil action for appropriate injunctive relief, or actual damages, or both within 90 days after the occurrence of the alleged violation of this act."

2

As noted in *Kimmelman*, a claim for wrongful discharge in violation of public policy may not be maintained if "there exists a statute explicitly proscribing a particular adverse employment action." *Id.* Plaintiffs argue that this rule does not bar their public policy claim because neither the WPA nor the Michigan Occupational Safety and Health Act prohibits employers from discharging employees who make "internal reports," as these statutes only protect employees who report, or are about to report, a violation or suspected violation of law to a public body or a workplace safety violation to the department of labor. Plaintiffs argue that they "made internal reports of unsafe surgical gowns that were leaking blood. . . . [to] Defendant Hospital and Defendant Robertson-Cain and agents, servants and employees of Defendant Hospital." Pls.' Br. at 19-20.

Even assuming that it would violate Michigan public policy for defendants to discharge plaintiffs in retaliation for making such "internal reports," this is not, according to the allegations in the FAC, what plaintiffs did. Rather, plaintiffs allege in their "common allegations" that in October 2018 Candace Follen reported the leaking surgical gowns to MIOSHA; that plaintiffs assisted MIOSHA with "any and all follow-up requests"; that later that month Candace Follen

---

The Michigan Occupational Safety and Health Act states:

> (1) A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under or regulated by this act or has testified or is about to testify in such a proceeding or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

Mich. Comp. Laws § 408.1065. Under subsections (2) through (6), an aggrieved employee may file a complaint with the department of labor and, if unsatisfied with the results of the administrative hearing, seek review in state circuit court.

"informed defendant Robertson-Cain of Plaintiffs['] involvement with OSHA/MIOSHA[2] and the items reported to them"; that MIOSHA investigated and gave the hospital "2 days to fix the problems"; that "Defendant Robertson-Cain was not pleased with this situation"; and that "approximately two months after Defendant Robertson-Cain was made aware of the MIOSHA/OSHA report and participation," both plaintiffs were discharged. FAC ¶¶ 9-15. Specifically in the paragraphs of the FAC under the Public Policy Violation count, plaintiffs allege that they "engaged in protected activity by conduct, including but not limited to: (a) Executing their duties and/or acting in accordance with laws; and/or (b) Exercising a right conferred by law"; and that they "engaged in protected activity, as aforesaid." *Id.* ¶¶ 26-27.

Nowhere do plaintiffs allege that they made any internal complaints (other than to inform Robertson-Cain that Candace Follen had made a complaint with MIOSHA) or that defendants discharged them in retaliation for making any internal complaints. Rather, plaintiffs clearly allege that their "protected activity" consisted exclusively of complaining to MIOSHA and participating in MIOSHA's investigation. The contours of plaintiffs' public policy violation claim are determined by the allegations in the FAC, not by the arguments plaintiffs present in their response brief. The claim, as alleged, is preempted by the WPA and the Michigan Occupational Safety and Health Act, as these statutes provide a remedy for such alleged retaliation. *See Dudewicz v. Norris-Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993) ("A public policy claim is sustainable, then, only where there also is not an applicable statutory prohibition against discharge in retaliation

---

[2] It is unclear why plaintiffs use "OSHA/MIOSHA" and "MIOSHA/OSHA," *see* FAC ¶¶ 9-12, 14-15, as the Michigan Occupational Safety and Health Administration ("MIOSHA") is a state agency while the (U.S.) Occupational Safety and Health Administration ("OSHA") is a federal agency, and plaintiffs do not allege that they made a complaint to OSHA.

for the conduct at issue"); *Kimmelman*, 753 N.W.2d at 268 (same). The Court shall therefore grant summary judgment for defendants on plaintiffs' public policy violation claim (Count II).

***WPA Claim***

Defendants next seek summary judgment on plaintiffs' WPA claim (Count I) on the grounds that (1) plaintiffs have no direct evidence of retaliation; (2) defendant Robertson-Cain, the alleged retaliator, was not involved in the decision to discharge plaintiffs; (3) those who were involved in deciding to discharge plaintiffs did not know who complained to MIOSHA; (4) if Robertson-Cain knew that Candace Follen complained to MIOSHA, she learned this in late October 2018, which is sufficiently removed in time from plaintiffs' termination to defeat a causal connection; and (5) defendants had a legitimate, non-retaliatory reason to discharge plaintiffs. *See* Defs.' Br. at 15-21. Plaintiffs dispute each of these points.

The Court has reviewed the lengthy briefs and hundreds of pages of exhibits submitted by the parties and finds that the facts are sufficiently disputed that the merits of plaintiffs' WPA claim must be decided by a jury. "To establish a prima facie case under this statute, a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471-72 (Mich. 2003). Defendants appear to concede that the first two elements of this claim are established. The issues defendants raise, all of which relate to the third element, cannot be resolved on summary judgment.

First, whether Robertson-Cain knew that Candace Follen was the employee who made the MIOSHA complaint is disputed, with Robertson-Cain testifying that she did not know who

5

complained, *see* Robertson-Cain Dep. at 18-19, 43-44, but a witness testifying that "Robertson-Cain personally told me . . . that she wanted to terminate Candace Follen's employment because she knew it was Candace Follen who called the public authorities, MIOSHA or OSHA, and made a complaint." Piecka Aff. ¶ 3. *See also* Piecka Dep. at 133-34, 137-39.

Whether Robertson-Cain was involved in the decision to discharge plaintiffs is also disputed. Robertson-Cain testified that she was not involved, *see* Robertson-Cain Dep. at 53, but she conceded that she was consulted as to whether James Follen should be reinstated in order to resolve the termination grievance filed by his union, and that she expressed the view "that we needed to uphold the termination." *Id.* at 46-47. Other witnesses also testified that Robertson-Cain had input into the decision whether to reinstate plaintiffs due to the importance of her position.[3] For example, Paula Coffee, the hospital's director of labor relations, testified that she consulted – and felt compelled to consult – Robertson-Cain (whom Coffee characterized as part of "the leadership") as to whether James Follen should be reinstated based on information gathered in the course of his grievance. Coffee Dep. at 14. Coffee testified that she consulted with Robertson-Cain and the chief nursing officer, Renee Emmerling, neither of whom wanted James Follen reinstated. *See id.* at 14-16. Coffee agreed that this decision was "their call," i.e., Robertson-Cain's and Emmerling's call. *Id.* at 16. Coffee's partner in the labor relations department, Kriss Weiss, confirmed that Robertson-Cain and Emmerling, the hospital's "senior leaders," were consulted about reinstating James Follen and that these two were part of a "group decision" not to do so. Weiss Dep. at 42-44. In light of this testimony, a factual dispute exists regarding Robertson-Cain's influence over the termination

---

[3] Robertson-Cain testified that she is "the director of perioperative services and women's and children's services, IV therapy in the medical procedures unit" and that she supervises "[o]ver 500" employees. Robertson-Cain Dep. at 4-5.

decision. If a jury determines that Robertson-Cain exercised any significant influence, and that she was aware that Candace Follen made the complaint to MIOSHA, then it is irrelevant whether others involved in the termination decision were aware that she is the employee who did so.

Nor are defendants entitled to summary judgment on plaintiffs' WPA claim on the grounds that too much time elapsed between Robertson-Cain learning that Candace Follen called MIOSHA and plaintiffs' termination. Michelle Piecka testified that it was "around the time OSHA [sic] was called" that "Robertson-Cain personally told me . . . that she wanted to terminate Candace Follen's employment because she knew it was Candace Follen who called the public authorities, MIOSHA or OSHA, and made a complaint." Piecka Dep. at 139; Piecka Aff. ¶ 3. MIOSHA's inspection occurred on October 30, 2018. *See* Pls.' Ex. 5. Plaintiffs were discharged on January 16, 2019, *see* Defs.' Ex. 17, after an investigation initiated by Robertson-Cain into plaintiffs' alleged misuse of FLMA leave. Robertson-Cain testified that Melissa Sparks showed her a photograph taken by Sparks' husband at a school field trip, which was organized by the school attended by the Sparks' daughter and plaintiffs' daughter. The photograph showed that plaintiffs were present at the field trip. Robertson-Cain believed this photograph showed that plaintiffs were engaging in "FMLA abuse" because they both had called off work that day, invoking intermittent FMLA leave due to flare-ups of their medical conditions. Robertson-Cain showed the photograph to her boss, Renee Emmerling, who told her to report it to human resources, which she did. *See* Robertson-Cain Dep. at 23-24. Apparently all of this occurred on the same day as the field trip, *see id.* at 24, which took place on December 17, 2018. *See* Defs.' Ex. 11.

On this record, a jury could find that Robertson-Cain learned on October 30, 2018, that Candace Follen contacted MIOSHA, and that six weeks later Robertson-Cain reported plaintiffs

7

to human resources for suspected FMLA abuse – a report that prompted human resources to conduct an investigation that led one month later to both plaintiffs being discharged. These events are close enough in time to permit a jury to conclude that Robertson-Cain took this action in retaliation for Candace Follen complaining to MIOSHA about the allegedly defective surgical gowns, particularly in light of Piecka's testimony that Robertson-Cain was "furious that OSHA [sic] was called. She knew it was Candace. . . . And she didn't want her there anymore." Piecka Dep. at 138. Additionally, as noted above, there is evidence that Robertson-Cain played a role not only in initiating the investigation that led to plaintiffs' discharge, but also in deciding not to reinstate James Follen. Combined, a reasonable jury could find that this evidence supplies the "[s]omething more than a temporal connection between protected conduct and an adverse employment action [that] is required to show causation where discrimination-based retaliation is claimed." *West*, 665 N.W.2d at 473.

Finally, as noted, defendants argue that they are entitled to summary judgment on plaintiffs' WPA claim because they had a legitimate, non-retaliatory reason to discharge plaintiffs – namely, their alleged dishonesty in committing "FMLA fraud." As discussed below, the Court rejects this argument, as the facts are disputed as to whether any such fraud occurred.

For these reasons, the Court shall deny defendants' motion for summary judgment on plaintiffs' WPA claim (Count I).

***FMLA Interference Claim***

Defendants next seek summary judgment on plaintiffs' "FMLA interference" claim (Count III). This claim is based on the allegation that defendants "fired both Plaintiffs after they properly took their FMLA intermittent leave, and stated that the reason [f]or the firings was some

pseudo, non-existent, pretextual policy violation of some sort"; and that "in willfully firing/removing Plaintiffs from their previous positions, Defendants . . . violated Plaintiffs' rights under the FMLA." FAC ¶¶ 44-45.

Clearly, plaintiffs do not allege that defendants interfered with their right to take FMLA leave, but that defendants retaliated against them for taking such leave. Plaintiffs acknowledge that they were permitted to take intermittent FMLA leave every time they requested it, and that they were always permitted to return to their positions. Their complaint is not interference, but retaliation. The Court shall therefore grant summary judgment for defendants insofar as plaintiffs claim interference with their FMLA rights, as the "essence" of their claim is retaliation for exercising those rights, *see Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012), and plaintiffs assert a separate claim for FMLA retaliation.

***FMLA Retaliation Claim***

Finally, defendants seek summary judgment on plaintiffs' claim that defendants retaliated against them for taking FMLA leave (Count IV). Having reviewed the parties' briefs and extensive attachments, the Court is persuaded that this claim must proceed to trial.

To state a prima facie case of FMLA retaliation, plaintiffs must show that they "engaged in FMLA-protected activity," that defendants knew they did so, that they "suffered an adverse employment action," and that "there was a causal connection between the protected FMLA activity and the adverse employment action." *Slusher v. U.S. Postal Serv.*, 731 F. App'x 478, 480 (6th Cir. 2018). Further,

> if the adverse employment action closely follows the protected activity, then temporal proximity alone is sufficient to satisfy the causation prong, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 529 (6th Cir. 2008), including time periods of just over two months,

9

> *Rogers*, 897 F.3d at 776-77, two-to-three months, *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283-84 (6th Cir. 2012), and three months, *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007).

*Tinsley v. Caterpillar Fin. Servs., Corp.*, 766 F. App'x 337, 344 (6th Cir. 2019). In the present case, all four elements are established. Defendants concede that plaintiffs had previously applied for, and had been granted permission to take, intermittent FMLA leave due to medical conditions that flare up periodically and unpredictably.[4] Plaintiffs took such leaves of absence, and defendants were aware that they did so. The leaves of absence in question took place on December 17, 2018, and plaintiffs were discharged one month later on January 16, 2019.

Having stated a prima facie case of FMLA retaliation, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). If defendants present such a reason, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Id.* "At the pretext stage, we consider whether [plaintiff] has adduced evidence which would enable a factfinder to conclude that [defendant's] stated reason . . . is not the true reason and is simply a pretext for unlawful retaliation." *Id.* at 572. "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger*, 681 F.3d at 285.

In the present case, defendants state that they discharged plaintiffs for "FMLA fraud" or "FMLA abuse." The purported basis for this is that both plaintiffs called off work shortly before

---

[4] Both plaintiffs have been diagnosed with rheumatoid arthritis; James Follen also has been diagnosed with degenerative disc disease. *See* Defs.' Exs. 8 and 9.

their morning shifts began on December 17, 2018, but then attended a school field trip with their daughter later that morning.[5] As noted above, the husband of one of plaintiffs' coworkers, Melissa Sparks, photographed plaintiffs at that event and sent the photograph to Sparks, who showed it to Robertson-Cain, who reported the suspected "fraud" to human resources. On January 16, 2019, defendant Weiss sent both plaintiffs a "Corrective Action Notice" stating they were terminated under the "Corrective Action Policy – specific to but not limited to making false claims for benefits,[6] leaves of absence" with the following explanation:

> You reported absent under Intermittent Family Medical Leave for your Dec 17, 2018, shift. You were observed that morning at a field trip with your child. This is a false and fraudulent claim for leave of absence benefits as you engaged in leisure activities under the guise of needing intermittent leave for a medical condition. This is in violation of the Corrective Action policy and results in the immediate termination of your employment.

Defs.' Exs. 17, 18.

While this explanation may be legitimate, plaintiffs have produced evidence which could well persuade a jury otherwise, and on summary judgment the Court must view the evidence in the light most favorable to the non-movants. For example, the mere fact that plaintiffs attended their daughter's field trip the same day they called off work is not necessarily evidence of fraud.

---

[5] Candace Follen called in on December 16 at 10:33 p.m.; James Follen called in on December 17 at 4:56 a.m. *See* Defs.' Ex. 10. Candace Follen testified that she called off work because "I was having a flareup and I didn't feel safe going to work knowing that I was going to be taking some medications that might not completely wear off" and because "I didn't know . . . what my condition would be in the morning." Candace Follen Dep. at 64-65. James Follen testified that he called off work because he was experiencing "a rheumatoid flare-up." James Follen Dep. at 50.

[6] The Court notes that plaintiffs' intermittent FMLA leave was unpaid. *See* James Follen Dep. at 106; Weiss Dep. at 13.

11

When plaintiffs called off work before their December 17 morning shifts, defendants were aware that plaintiffs' physicians had previously certified that plaintiffs have medical conditions which may cause them to be periodically, and temporarily, unable to work. *See* Defs.' Exs. 8, 9. Candace Follen's physician certified that her flare-ups of rheumatoid arthritis may cause her to be absent up to three times per month and that each absence could last from fifteen minutes to seven days. Defs.' Ex. 9 (PageID.639). James Follen's physician certified that his flare-ups of rheumatoid arthritis and degenerative disc disease may cause him to be absent up to four times per month and that each absence could last from one hour to forty-eight hours. Defs.' Ex. 8 (PageID.635). There is nothing necessarily inconsistent with plaintiffs not feeling well enough to care for patients or to assist with surgery but feeling well enough, several hours later, to attend an event, which required them to do nothing more than observe their daughter and her classmates volunteer at a soup kitchen. James Follen testified that he felt better as the day went on, but that his flare-ups prevent him from administering medications, bathing patients, or providing other aspects of patient care. *See* James Follen Dep. at 43-44, 50. Candace Follen testified that at the time of the field trip her "hands still hurt." Dep. at 66. She also indicated that flare-ups of the arthritis in her hands interferes with her ability to work because, as a surgical technician, it is "[h]ard to pass a blade safely to a surgeon or sutures or any of that when your hands are like aching and they're swollen." *Id.* at 43. Under these circumstances, a jury might well reject defendants' "fraud" explanation because plaintiffs' ability to stand and observe at a soup kitchen for "[l]ess than an hour," James Follen Dep. at 51, does not necessarily mean that they were able to engage in skilled hospital work.

      Defendants point to the fact that plaintiffs both called off work for the same shift, but this is not necessarily evidence of fraud either. As noted, both plaintiffs had physicians'

12

certifications attesting that they may need to takes leaves of absence as frequently as three to four times per month and for hours or days at a time. In fact, defendants concede that in 2018 alone plaintiffs took intermittent FMLA leaves of absence on the same days on thirteen occasions without suffering any disciplinary action. *See* Defs.' Br. at 6. While defendants find this overlap "suspicious," *id.*, a jury could reasonably conclude that it is simply due to the frequency and duration of plaintiffs' medically required absences. A jury might also reasonably ask why defendants found plaintiffs' overlapping leaves of absence to be proof of fraud on December 17, 2018, but not on the many other occasions in 2018 when their leaves of absence coincided.

Defendants also suggest that plaintiffs pre-planned and coordinated their absences in order to attend their daughter's field trip. A jury can make this determination, but both plaintiffs deny that they did so. *See* Candace Folllen Dep. at 64, 68; James Follen Dep. at 53-54. Nor did Paula Coffee, defendants' top human resources representative, "think [James Follen] was being untruthful." Coffee Dep. at 14.

In short, defendants are not entitled to summary judgment on plaintiffs' FMLA retaliation claim because the legitimacy of defendants' explanation for discharging plaintiffs is genuinely disputed. A jury could reasonably conclude that plaintiffs committed no "fraud" in taking intermittent FMLA leave on December 17, 2018, and that this supposed fraud has "no basis in fact," "did not actually motivate," and/or was "insufficient to warrant" defendants' decision to discharge these experienced, skilled employees. *Seeger*, 681 F.3d at 285. A jury might also find the alternative explanation – that plaintiffs caused embarrassment over the MIOSHA complaint – to be the actual reason they were discharged. This claim, along with plaintiffs' WPA claim, must therefore be resolved at trial. Accordingly,

13

IT IS ORDERED that defendants' motion for summary judgment is granted in part and denied in part as follows: the motion is granted as to plaintiffs' public policy violation and FMLA interference claims (Counts II and III) but denied as to plaintiffs' WPA and FMLA retaliation claims (Counts I and IV).

Dated: April 15, 2021
Detroit, Michigan

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE